Shelly George
7149 E. Jolly Rogue Ln.
Williams, AZ 86046
480-749-0575
a2zsouth@gmail.com

✓ FILED ___ LODGED
___ RECEIVED ___ COPY
SEP 11 2026
CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY ___ DEPUTY

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

CV26-08218-PCT-KML

**SHELLY GEORGE,**

Plaintiff

v.

**BROOKE L. ROLLINS,**

Secretary, U.S. Department of Agriculture

Defendant

Civil Action

Date; 9/11/2026

## COMPLAINT OF DISCRIMINATION

### CONTINUING RETALIATORY HOSTILE WORK ENVIRONMENT: ESCALATING RETALIATION, WEAPONIZATION OF THE REPORTING PROCESS, AND WILLFUL INTERFERENCE WITH PROTECTED ACTIVITY

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law, including Title VII of the Civil Rights Act of 1964, as applied to federal employment through 42 U.S.C. § 2000e-16, and the corresponding federal sector administrative framework in 29 C.F.R. Part 1614. Plaintiff has completed the administrative process required for the claims presented here and received the Agency's June 17, 2026 Final Agency Decision. Plaintiff timely brings this civil action following that final agency action. Venue is proper in the United States District Court for the District of Arizona because the employment relationship at issue and the events giving rise to Plaintiff's claims occurred in Arizona, including at the Williams/Tusayan Ranger District of the Kaibab National Forest.

Plaintiff brings this action principally under Title VII's anti retaliation provision, 42 U.S.C. § 2000e-3(a), as applied to federal employment through 42 U.S.C. § 2000e-16(a), and under the federal-sector prohibition against retaliation for protected EEO activity. Section 2000e-3(a) protects an employee because the employee has opposed practices made unlawful by Title VII or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing. Section 2000e-16(a) makes the federal government subject to Title VII's prohibition against discrimination in federal employment. Plaintiff therefore alleges both retaliation for protected opposition and retaliation for protected participation. The substantive framework governing this action must account for the broader protection afforded by the anti retaliation provision, including conduct that is reasonably likely to deter protected activity, rather than limiting actionable retaliation to conduct independently altering compensation, terms, conditions, or privileges of employment. See *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 61–71 (2006); *Ray v. Henderson*, 217 F.3d 1234, 1242–43 (9th Cir. 2000). Plaintiff further invokes the statutory protection of § 717 against discrimination and reprisal in federal employment and alleges that the Agency's conduct was motivated, in whole or in part, by Plaintiff's protected activity. Where the record supports both lawful and unlawful reasons for the challenged conduct, Plaintiff relies on Title VII's mixed motive framework rather than imposing the private sector but for causation standard applicable in other contexts. See 42 U.S.C. § 2000e-2(m); *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 848–50 (9th Cir. 2002) (en banc), aff'd, 539 U.S. 90 (2003).

## PLAINTIFF EXHAUSTED THE ADMINISTRATIVE PROCESS APPLICABLE TO THE CLAIMS PRESENTED IN THIS ACTION.

**1.** Plaintiff exhausted the administrative remedies applicable to this action. Plaintiff pursued Agency EEO Complaint No. FS-2025-00372 through counseling, formal complaint, investigation, and administrative adjudication. The Agency investigated the accepted allegations and issued its Final

Agency Decision on June 17, 2026, addressing claims of age discrimination and reprisal, including restrictions and denials concerning Plaintiff's EEO participation, rejection of Plaintiff's time sheet, and related incidents of supervisory harassment. The Agency therefore had a full opportunity to investigate and adjudicate the underlying retaliatory conduct before Plaintiff sought judicial relief. Plaintiff's claim is not based upon a collection of unrelated workplace events, but upon a continuing retaliatory hostile work environment placed before the Agency through the accepted harassment and reprisal allegations and the administrative record developed from them.

**2.** Additional retaliatory incidents occurred after the investigation had closed and while Plaintiff's EEO complaint remained pending before the Commission. Plaintiff requested an EEOC hearing on December 23, 2025. On January 21, 2026, Agency attorney Alexander Viana contacted a subordinate coworker and witness concerning Plaintiff's pending EEO matter, after which the coworker expressed fear regarding participation in Plaintiff's EEO case and became distant and hesitant in her interactions with Plaintiff. On February 10, 2026, Plaintiff's supervisor, Melissa Muise, issued a directive barring Plaintiff's representative, Mark Davenport, from entering the workplace, following an accusation involving the same coworker. Plaintiff presented both incidents to Administrative Judge Eric Yau in her February 25, 2026 Motion to Amend in EEOC No. 833-2026-00328X. The Administrative Judge denied the motion on April 16, 2026, and Plaintiff filed a written objection on April 17, 2026 expressly preserving the asserted errors for further administrative review and subsequent civil action.

**3.** The procedure governing these later incidents was 29 C.F.R. § 1614.106(d), which permits a complainant, after requesting a hearing, to move before the Administrative Judge to amend a pending complaint to include issues or claims that are like or related to those already raised. The Commission's Management Directive 110 explains that this procedure was adopted to prevent fragmentation of related claims and that no new counseling is required for a like or related amendment; a later incident is

like or related where it adds to or clarifies the pending claim or could reasonably have been expected to grow out of the original complaint or its investigation. See 29 C.F.R. § 1614.106(d); EEOC Management Directive 110, Ch. 5, § III.B.2; *Scher v. U.S. Postal Service*, EEOC Request No. 05940702 (May 30, 1995). Plaintiff invoked that mechanism while the complaint was pending and affirmatively placed the January 21 and February 10 incidents before the Administrative Judge. The fact that the Administrative Judge declined to grant amendment does not change the fact that Plaintiff presented and preserved those allegations through the very procedure established for later, related incidents arising during a pending EEO proceeding.

**4.** Ninth Circuit law likewise prevents administrative exhaustion from becoming a requirement that an employee repeatedly restart the administrative process for each related retaliatory act that occurs while the matter is pending. A judicial complaint may encompass allegations that are "like or reasonably related" to those presented administratively, including new acts occurring during the pendency of the administrative charge. *Oubichon v. North American Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir. 1973). The Ninth Circuit also asks whether the judicial allegations fall within the scope of the actual investigation or an investigation that could reasonably have been expected to grow out of the administrative charge. *B.K.B. v. Maui Clothing Co.*, 276 F.3d 1091, 1100 (9th Cir. 2002); *Lyons v. England*, 307 F.3d 1092, 1104 (9th Cir. 2002). In *Sosa v. Hiraoka*, 920 F.2d 1451, 1456–57 (9th Cir. 1990), the court recognized that subsequent acts arising from the same alleged retaliatory pattern may fall within the scope of the administrative allegations. Plaintiff therefore does not ask the Court to treat every later event as an automatically exhausted discrete claim; rather, Plaintiff alleges that the 2026 witness contact and representative restriction incidents were related acts arising from the same retaliatory EEO context and were additionally presented to the Administrative Judge during the pendency of the administrative proceeding.

**5.** The scope and timeliness of Plaintiff's hostile work environment claim are governed by *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 115–18 (2002). *Morgan* distinguishes discrete acts, which ordinarily require independent timeliness, from hostile work environment claims, which by their nature involve repeated conduct that collectively constitutes one unlawful employment practice. *Id.* at 115-18. When related acts contribute to the same continuing hostile environment and at least one contributing act falls within the applicable filing period, the Court may consider the entire course of conduct; earlier acts may also remain relevant as background evidence even where they are not independently actionable. *Id.* at 113, 117. The Ninth Circuit applies a cumulative approach to hostile environment claims. *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1108 (9th Cir. 1998). The merits inquiry likewise requires consideration of the totality of the circumstances rather than each incident in isolation. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–23 (1993). Plaintiff therefore relies upon the 2023 and 2024 incidents, the HART process and its handling, the 2025 scrutiny and interference with EEO participation, and the 2026 witness and representative incidents as components of the alleged continuing retaliatory environment where legally applicable and, alternatively, as background evidence bearing on motive, nexus, pattern, context, cumulative severity and pervasiveness, and the reasonably likely to deter standard governing reprisal.

**6.** The Agency's own HART process further demonstrates that the Agency had actual notice of serious allegations concerning Plaintiff's treatment well before the later escalation. HART was the Agency's designated harassment reporting mechanism, and Plaintiff used that mechanism to report supervisory misconduct. In 2023, the HART record placed before the Agency included extensive allegations concerning Plaintiff's treatment by supervisor Nora McArdle RMO, including false allegations attacking Plaintiff's competence, integrity, and professional reputation which should have

been enough to put the Agency on notice of the hostility, but, the Agency ignored it. In 2024, Plaintiff again reported harassment and related misconduct through the Agency's HART process, Case No. H-2024-00013. Although the AR Group conducted an inquiry, the management official whose conduct was principally at issue, Debra Mollet RMO, did not participate in the scheduled March 13, 2024 interview and did not respond to follow up communications. The Agency nevertheless permitted the matter to proceed without obtaining her participation, and Forest Supervisor Nicole Branton, who supervised Mollet and was also involved in Plaintiff's EEO matters, personally issued the disposition. Plaintiff alleges that the Agency's failure to take effective corrective action after receiving notice, together with its decision to permit the principal responding management official not to participate and then to allow an official within her supervisory chain to issue the dispositive determination, is evidence bearing on the adequacy of the Agency's response and the continuation of the hostile environment. Under Ninth Circuit law, an employer's response to known harassment must be prompt and effective; an investigation alone does not satisfy that obligation. *Fuller v. City of Oakland*, 47 F.3d 1522, 1528–29 (9th Cir. 1995); *Swenson v. Potter*, 271 F.3d 1184, 1192–93 (9th Cir. 2001). Plaintiff further alleges that the Agency subsequently relied upon the HART matter within the EEO litigation, making the Agency's handling of its own mandatory reporting mechanism relevant not only to notice and failure to correct, but also to the alleged retaliation, interference, motive, and continuing nature of the hostile work environment.

## INTRODUCTION

**7.** Plaintiff brings this action alleging a continuing retaliatory hostile work environment that began in 2023 and escalated through the Agency's 2024, 2025, and 2026 EEO matters. Beginning in 2023, Plaintiff engaged in protected activity, including opposition to conduct she reasonably and in good faith believed to constitute unlawful discrimination, harassment, and retaliation, followed by formal

participation in the EEO process. Agency management officials were aware of Plaintiff's protected activity at each stage. The conduct that followed was not a series of unrelated workplace disagreements. Plaintiff alleges that it developed into a connected and escalating course of scrutiny, hostility, interference, intimidation, and removal of job responsibilities that materially affected her working conditions and was reasonably likely to deter continued protected activity.

**8.** The Complaint is organized into three sections that present the chronological development of that continuing retaliation. The first section addresses the origin of the hostile work environment in 2023, including Plaintiff's opposition to management conduct, the accusations directed against her, and the early misuse of supervisory authority that marked the beginning of the retaliatory pattern. The second section addresses the weaponization of the Agency's mandatory harassment reporting mechanism, the HART process, which Plaintiff used as the Agency's designated means of reporting supervisory misconduct. Plaintiff alleges that the HART process was then used in ways that obstructed her protected opposition, interfered with her EEO participation, and placed the reporting mechanism itself into the retaliatory chain of events. The third section addresses the escalation in 2025 and 2026, including heightened scrutiny of Plaintiff's leave, timekeeping, workplace presence, and EEO participation; inquiries concerning Plaintiff made through subordinate employees; repeated removal of supervisory functions and job responsibilities; unauthorized contact with a subordinate witness; and restrictions imposed on Plaintiff's ability to obtain assistance from her representative.

**9.** Plaintiff alleges that these events, considered together and in their full context, constitute a continuing retaliatory hostile work environment under controlling Supreme Court and Ninth Circuit precedent. Each incident is significant not merely in isolation, but as part of the cumulative course of conduct that followed management's knowledge of Plaintiff's protected opposition and EEO participation. The three sections therefore present a unified factual record showing the progression

from Plaintiff's protected opposition, to the use of the Agency's own reporting mechanism as an instrument of interference, to escalating scrutiny, intimidation, loss of authority, and interference with protected EEO participation. Plaintiff alleges that the cumulative conduct was reasonably likely to deter protected activity and, through its persistence and escalation, materially altered the conditions of her employment.

**ORIGIN OF HOSTILE WORK ENVIRONMENT IN 2023 2024 AND COMMENCEMENT OF CONTINUING RETALIATION**

**10.** Plaintiff alleges that her continuing retaliatory hostile work environment began in 2023 and continued through the 2024, 2025, and 2026 EEO matters. The 2023 events establish the beginning of the hostile treatment, the management officials involved, the nature of the accusations made against Plaintiff, and the subsequent progression from attacks on Plaintiff's professional reputation to intrusion into her personal financial affairs and, later, the progressive removal of job functions or Supervisor authority, Plaintiff had previously performed. Plaintiff relies upon these earlier events both as factual components of the continuing hostile work environment and, to the extent any particular event is not independently actionable, as background evidence of motive, management knowledge, pattern, and escalation. See Harris v. Forklift Systems, Inc., 510 U.S. 17, 21–23 (1993); National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 115–17 (2002); Burlington Northern and Santa Fe Railway Co. v. White, 548 U.S. 53, 68–69 (2006).

**11.** In November 2022, Nora McArdle became Plaintiff's supervisor, Nicole Branton was Nora supervisor. Plaintiff had already been performing her Administrative Support Assistant duties at the Williams Ranger District, including responsibilities involving employee housing, rental and housing administration, supplies and purchasing, office support, inspections, and related administrative functions. Plaintiff's employment record reflected continued employment and satisfactory job

performance. See; ( Plaintiff Exhibit 22, Job Appraisals for Supervisors, 2023, 2024, 2025 ). Plaintiff had not accumulated the disciplinary or warning history that McArdle later portrayed in the HART inquiry. See; ( Plaintiff Exhibit Five B, HART Report Nora McArdle 2023, Case Number FS-2024-00693, ROI 000689 ).

**12.** On March 10, 2023, McArdle came to Plaintiff's office at the Williams Ranger District and directed Plaintiff to travel to the Tusayan Ranger District to perform front office firewood permit sales and related collection functions, ( McArdle admitted she required George to work in the Tusayan office, 000683 ROI agency case; FS-2024-00693 ). The assignment required Plaintiff first to report to the Williams Ranger District, obtain a Forest Service vehicle, drive more than sixty miles to Tusayan, perform the requested work, return the government vehicle to Williams, and then repeat the same process the following day.

**13.** The assignment was unusual because Plaintiff's ordinary duties included housing, rental administration, inspections, office supplies, purchasing, and related administrative responsibilities, while selling firewood permits at the Tusayan Ranger District was not Plaintiff's assigned job function. More importantly, the firewood sales that McArdle identified as the reason for sending Plaintiff to Tusayan were not scheduled to begin until April 14, 2023. There were no firewood permits to issue. Thus, when McArdle demanded on March 10 that Plaintiff begin making the more than sixty mile daily trip for that purpose, the stated operational reason for the assignment did not correspond with the date on which the firewood permit activity was actually scheduled to begin.

**14.** Plaintiff informed McArdle that she could assist with coverage but could not make the demanded daily trip under the circumstances. Plaintiff explained that she needed to remain closer to her ninety year old mother and that the required travel would create a serious problem if she were needed to

respond to her mother's needs. McArdle nevertheless continued to insist that Plaintiff travel to Tusayan. Plaintiff had active FLMA for that stated reason and McArdle her supervisor knew this.

**15.** Plaintiff alleges that the March 10 assignment was not a routine scheduling decision because it removed Plaintiff from the work she ordinarily performed in Williams, required repeated unnecessary travel of more 120 miles s day in a government vehicle, involved work that was not Plaintiff's ordinary assignment, and was ordered at a time when the stated firewood activity was ceased for the year. Plaintiff reasonably understood the assignment, in context, as an effort to push her out of her normal work environment and to make her position increasingly untenable. "McArdle explained George is also the Tenant Manager", ROI 000684, page 5, ¶ 4, agency case; FS-2024-00693.

**16.** During the same March 10 confrontation, McArdle told Plaintiff to "find a new desk" and "find another job." Plaintiff states that she asked McArdle what she meant because the statement was confusing and threatening. Plaintiff understood McArdle to indicate that McArdle and second level Supervisor Branton had discussed Plaintiff needing to find another position the previous week. McArdle also told Plaintiff, "this isn't going to work out between us." These statements caused Plaintiff to fear that management was attempting to remove her from her position or force her out of the work unit.

**17.** Plaintiff reasonably believed that McArdle's conduct was related to Plaintiff's age and to Plaintiff's refusal to comply with directives that Plaintiff reasonably believed were improper or outside the normal scope of her position. Plaintiff was born in 1959 and was the subject of age based discrimination allegations in the EEO matter Plaintiff initiated shortly thereafter. Plaintiff's belief was made in good faith based on the circumstances confronting her at the time.

**18.** Plaintiff sought guidance from management officials above McArdle concerning the disputed assignment and housing matters. McArdle reacted negatively to Plaintiff's effort to obtain such

guidance and accused Plaintiff of going "behind her back." Plaintiff's effort to seek guidance and challenge conduct she reasonably believed was improper preceded the formal EEO activity that followed.

**19.** In March 2023, Plaintiff contacted the Agency's Office of Civil Rights and initiated EEO Complaint No. FS 2023 00277 concerning harassment and discrimination. The Agency identified age, with Plaintiff's year of birth listed as 1959, and sex as alleged bases. On April 7, 2023, the Agency issued Plaintiff a Notice of Right to File advising her of her right to file a formal discrimination complaint with the Department of Agriculture. See: ( Plaintiff Exhibit Six, Notice of Rights, April 7, 2023 ). Plaintiff pleads FS 2023 00277 as the beginning of the protected EEO activity that provides the foundation for the reprisal theory alleged in this action.

**20.** After Plaintiff complained about McArdle's conduct, McArdle provided a written statement to the Agency's HART process dated April 2023. Instead of limiting her response to the disputed March 10 assignment, McArdle made broad allegations attacking Plaintiff's professional competence, reliability, and compliance with management direction. McArdle stated that "Everything I have asked George to do, George has flat out refused to do or failed to do it," and further stated that Plaintiff "continues to refuse to perform tasks" assigned by McArdle and others. See; ( Plaintiff Exhibit Five B, HART Report, Nora McArdle 2023, Case No. FS 2024 00693, ROI 000689 ), p. 4 ¶ 4.

**21.** McArdle further stated that Plaintiff had received verbal reprimands and that management had recently found it necessary to work with Employee Relations to compile a written reprimand. See; ( Plaintiff Exhibit Five B, HART Report, Nora McArdle 2023, ROI 000689 ), p. 4 ¶ 4. Plaintiff alleges that these assertions were false and unsupported and demonstrate the Agencys retaliatory nature. Plaintiff's employment record did not establish the disciplinary history McArdle attributed to her, and

Plaintiff had not been issued the warnings or discipline necessary to support McArdle's sweeping characterization of Plaintiff as a repeatedly insubordinate employee.

**22.** McArdle's allegations therefore attacked more than Plaintiff's position concerning one disputed assignment. They portrayed Plaintiff to her employer as an employee who routinely refused assignments, repeatedly failed to perform her job, had already been verbally reprimanded, and was subject to an impending written reprimand. Plaintiff alleges that these statements were false and professionally damaging and were made in the aftermath of Plaintiff's complaint about McArdle's conduct.

**23.** McArdle also attempted to portray the March 2023 dispute as involving Plaintiff's improper administration of government housing. McArdle stated that Plaintiff was responsible for housing functions and asserted that Plaintiff had altered housing ratings and thereby significantly reduced rent without authorization. See; ( Plaintiff Exhibit Five B, HART Report, Nora McArdle 2023, ROI 000689 ), p. 5 ¶ 1.

**24.** McArdle further asserted that Plaintiff had refused to comply with management direction concerning the housing rating and that Plaintiff's conduct had caused an employee tenant to incur thousands of dollars in additional costs. See; ( Plaintiff Exhibit Five B, HART Report, Nora McArdle 2023, ROI 000689 ), p. 5 ¶ 4. This type of accusation would anger her coworkers. Plaintiff was in fear after these false accusations by McArdle were made.

**25.** Plaintiff alleges these accusations were false. Plaintiff did not possess authority to alter McArdle's personal housing rent for McArdle's benefit, and Plaintiff had no legitimate reason to falsify an official housing rating. Plaintiff understood that falsifying a government housing record or using an official position to confer a personal financial benefit could expose her to serious employment consequences. Plaintiff therefore reasonably believed that McArdle was attempting to place Plaintiff in an impossible

position: either alter an official housing record in a manner Plaintiff believed improper or face hostility and accusations of refusing management direction.

**26.** Plaintiff particularly disputes McArdle's allegation that Plaintiff improperly lowered the rent on housing throughout the Williams and Tusayan Ranger Districts. McArdle stated that Plaintiff "lowered the rent for every single house in the WRD and TRD except my house." See Plaintiff Exhibit Five B, HART Report, Nora McArdle 2023, ROI 000689, p. 6 ¶ 2. Plaintiff alleges that she did not possess the authority to unilaterally reduce McArdle's rent and that the allegation improperly attributed to Plaintiff an act she was not authorized to perform. McArdle states her self, she needed permission from her supervisor to address rent issues; "Due to her position as both landlord and tenant, McArdle maintains she does not take action without alerting her supervisor " Page 6 ¶ 1 ROI 000685, Agency Case No. FS 2024 00693 ).

**27.** McArdle additionally stated that her supervisor directed her to have Plaintiff change the rating of McArdle's own residence and that McArdle conveyed that supposed direction to Plaintiff while copying the supervisor on an email. See; ( Plaintiff Exhibit Five B, HART Report, Nora McArdle 2023, ROI 000689 ), p. 6 ¶ 2. Plaintiff does not admit that such authorization existed. Plaintiff alleges that the Agency has not produced documentary evidence establishing that a supervisor actually directed Plaintiff to reduce the rating of McArdle's personal residence for purposes of reducing McArdle's rent. McArdle's supervisor at this time was Nicole Branton.

**28.** The significance of this allegation is not merely the disputed housing transaction. McArdle's account, if accepted, would place Plaintiff in the position of manipulating an official government housing record for the financial benefit of her own supervisor. Plaintiff understood that such conduct could jeopardize her employment. Plaintiff therefore reasonably perceived McArdle's demand, together with the threat to "find a new desk" and "find another job," as creating a situation in which Plaintiff

could either risk her employment by performing an act she believed improper or resist the demand and be characterized as insubordinate.

**29.** McArdle's HART statement also contains a significant contradiction in the way she characterized Plaintiff's authority and conduct. McArdle acknowledged that Plaintiff was the Tenant Manager and that Plaintiff performed housing functions, yet simultaneously characterized Plaintiff's exercise of housing related responsibilities as unauthorized misconduct. See: ( Plaintiff Exhibit Five B, HART Report, Nora McArdle 2023, ROI 000689 ), pp. 5–6.

**30.** The combination of McArdle's statements concerning Plaintiff's supposed chronic refusal to work, supposed verbal reprimands, threatened written reprimand, alleged unauthorized housing activity, and alleged financial harm to an employee tenant materially damaged Plaintiff's professional reputation. Plaintiff alleges that these statements were hostile and were part of the environment she experienced.

**31.** McArdle subsequently left the immediate work unit supervisory role, and Debra Mollet became Plaintiff's supervisor during 2023. The workplace conflict did not end when McArdle left. Instead, the nature of the conflict changed and expanded.

**32.** Beginning in 2023, Plaintiff also became the subject of management involvement concerning an unrelated personal financial matter involving relocation expenses, tax treatment, and collection activity. The matter arose from Plaintiff's personal relocation history and had affected her credit and tax refund. It did not concern the performance of Plaintiff's duties as an Administrative Support Assistant.

**33.** Plaintiff initially sought assistance from financial personnel outside her local supervisory chain. Plaintiff did not initially ask Mollet to participate in the matter and did not believe her local supervisor needed to know the details of her personal taxes, relocation debt, credit reporting, or collection history.

**34.** On October 17, 2023, Linda M. Smith, Assistant Director, Customer Services, contacted Forest Supervisor Nicole Branton and District Ranger Debra Mollet regarding Plaintiff's complaints about the relocation and collection matter. Smith described Plaintiff's communications as concerning the Transfer of Station matter and forwarded Plaintiff's emails to Branton and Mollet. Branton asked Smith to forward the underlying communications and subsequently directed Smith to work with Mollet because Mollet was Plaintiff's supervisor. The financial issues were related to her prior employment in New Mexico.

**35.** Smith's October 17, 2023 communications expressly identified Plaintiff's September 28, 2023 written complaint in which Plaintiff reported what she believed were acts of fraud, incompetence, and possible collusion to conceal wrongdoing, the billing amount for moving was several thousand dollars over what it actually was paid and she was being billed in part for year she did not move. The management chain therefore knew that Plaintiff was making serious written complaints about perceived wrongdoing before the subsequent management involvement and HART events.

**36.** On November 20, 2023, Mollet approached Plaintiff in her office concerning the financial matter shortly after Plaintiff had again written to Smith requesting a response. Plaintiff had not requested Mollet's involvement in her personal financial affairs. Plaintiff nevertheless agreed to discuss the matter after receiving and reviewing the documentation she had repeatedly requested. Mollet works for the Federal Government, she is not a dept collector or payroll official involved in tax collections.

**37.** On November 24, 2023, Plaintiff expressly objected in writing to Mollet's involvement and stated that Mollet did not need to be involved in the private collection matter and should not have been contacted concerning it. Plaintiff explained that she was willing to meet only after receiving and reviewing the documents she had repeatedly requested.

**38.** On December 13, 2023, Mollet responded that Plaintiff "does not have the option of excluding me as your Supervisor or the individuals involved from further discussion." Plaintiff alleges that this response intensified the hostile environment because Mollet asserted supervisory authority over an unrelated personal financial matter after Plaintiff had expressly objected to her involvement. Mollet states; "As I explained last week, you do not have the option of excluding me as your Supervisor or The individuals involved from further discussion," see; Email evidence, ROI 000164 agency case; FS-2024-00693 VOL 1.

**39.** The December 13 exchange is significant because Plaintiff's taxes, debt, credit report, relocation accounting, and collection history were not ordinary subjects of her supervisory duties. Plaintiff was attempting to distinguish her personal financial affairs from her employment relationship. Mollet rejected that boundary and insisted on remaining involved. Agency conducted and investigation over the matter and Mollet would not participate in the investigation, See; ( Plaintiff Exhibit Eight B, HART report 2023, Debra Mollet refuses HART, Case Number FS-2024-00693 ).

**40.** On December 15, 2023, Plaintiff responded that Mollet had inaccurately characterized their prior communications and again requested an investigation. Plaintiff stated that she would not continue discussing the matter outside an investigative process so as not to compromise the integrity of the investigation. Plaintiff alleges that management's continued insistence on discussing the matter with her supervisor contributed to the hostile and intimidating environment.

**41.** The Agency's own subsequent HART record confirms that the financial matter and Mollet's involvement were investigated. The April 22, 2024 AR Group report identified as an issue whether Smith had released Plaintiff's personal information to Mollet in retaliation against Plaintiff. The same report records that Mollet failed to appear for her scheduled March 13, 2024 interview and did not respond to follow up communications, and therefore the inquiry proceeded without her participation.

See: ( Plaintiff Exhibit Five A, HART Report Debra Mollet 2023, Case No. FS 2024 00693, ROI 000724000709 ).

**42.** Plaintiff's 2024 EEO activity followed this continuing conflict. Plaintiff contacted an EEO Counselor on August 9, 2024 concerning Agency Case No. FS 2024 00693. The Agency's Counselor Report identifies July 16, 2024 as the alleged discriminatory event and confirms that August 9, 2024 fell within the applicable counseling period. A Notice of Right to File was issued on October 29, 2024, after which Plaintiff filed the formal complaint. The 2024 complaint included age and reprisal harassment allegations. See; ( Plaintiff Exhibit Three, 8/9/2024 Counselors Report).

**43.** The progression from the 2023 events into the 2024 matter is significant. Plaintiff did not experience the 2023 McArdle confrontation, the professional accusations contained in McArdle's HART statement, the subsequent Mollet financial involvement, and the later HART proceedings as unrelated events. They arose within the same Forest Service work unit, involved overlapping management officials, followed Plaintiff's complaints and protected activity, and formed the factual history preceding the accepted 2025 reprisal allegations.

**44.** Plaintiff subsequently filed Agency Case No. FS 2025 00372 on June 18, 2025, alleging harassment based on age (YOB 1959) and reprisal for prior EEO activity. The Agency issued its Acceptance Letter on July 11, 2025. This matter later became EEOC Case No. 833 2026 00328X. Plaintiff alleges that the removal of her job authority in 2025 and 2026 occurred after the filing and acceptance of FS 2025 00372 and constitutes ongoing reprisal and harassment.

**45.** Plaintiff filed her February 25, 2026 Motion to Amend in FS 2025 00372 to consolidate the continuing retaliatory conduct and additional incidents occurring while the proceeding remained pending. Plaintiff alleges that the removal of her supervisory functions, purchasing authority, housing responsibilities, repair responsibilities, tenant placement responsibilities, and Tusayan housing contract

responsibilities occurred in close temporal sequence with her protected EEO activity and were intended to degrade her role as a supervisor.

**46.** The removal of Plaintiff's job responsibilities occurred against this background of escalating conflict and protected EEO activity. Plaintiff's purchasing authority, office ordering functions, housing inspection responsibilities, tenant placement responsibilities, housing contract responsibilities, and repair related functions were progressively removed or reassigned after Plaintiff had performed those functions as part of her position. Plaintiff alleges that these removals were not administrative adjustments but retaliatory acts intended to degrade her role as a supervisor and materially alter the conditions under which she performed her work.

**47.** The first documented removal of these functions occurred in or about March 2023, during the period in which McArdle was disputing Plaintiff's performance and housing responsibilities and immediately after Plaintiff's first EEO activity. Plaintiff alleges that purchasing, repair, inventory, and housing related responsibilities were reduced or removed from her at that time. Plaintiff further alleges that these removals occurred in close temporal proximity to her protected activity and were part of the same hostile environment.

**48.** Plaintiff's later records demonstrate that these were actual functions of her position, not duties invented for purposes of litigation. Plaintiff had performed employee housing inspections, maintained housing related records, worked with supplies and purchasing, and performed tenant management functions before the later delegation changes. Plaintiff's digital signatures on housing inspection documents for 2023, 2024, and 2025 confirm that she previously exercised these responsibilities before they were reassigned.

**49.** On or about February 8, 2025, Plaintiff's Government purchase card authority was removed or effectively disabled. The Access Online electronic record identifies Plaintiff's account as open but

shows a $1.00 credit limit and $1.00 available credit. The record therefore documents that Plaintiff no longer possessed meaningful purchasing authority through the account she had previously used for official business. Plaintiff alleges that this removal occurred after her protected activity in FS 2024 00693 and shortly before the filing of FS 2025 00372, and that the timing supports an inference of reprisal. See Plaintiff Exhibit Twenty One.

**50.** Plaintiff states that the purchase card had been used to purchase supplies for the entire building, including paper, printer ink, and other office necessities, and to pay for work performed on Forest Service quarters, bunkhouses, and other building maintenance needs. Plaintiff alleges that the removal of purchasing authority prevented her from independently handling these matters and required her to seek assistance or permission through other Agency personnel, thereby diminishing her supervisory autonomy.

**51.** Plaintiff's office ordering responsibilities were also removed in or about March 2025. After the change, Plaintiff was required to route purchases through others rather than independently perform the ordering function she had previously performed. Plaintiff alleges that this removal occurred after the filing of FS 2025 00372 and constitutes ongoing reprisal and harassment.

**52.** Plaintiff's responsibility for repairs was likewise removed in or about March 2025. Before that change, Plaintiff had been able to address or arrange ordinary repairs associated with her administrative responsibilities, including broken heaters, water heaters, leaks, and other maintenance needs. Afterward, even ordinary maintenance needs were required to be routed through other offices or personnel. Plaintiff alleges that this removal prevented her from performing her supervisory duties in a timely manner and required her to seek permission from Engineering to fix basic issues such as leaking toilets and kitchen faucets in older Forest Service facilities.

**53.** Housing inspection responsibilities were repeatedly taken away from Plaintiff, including changes affecting 2023, 2024, and 2025. Plaintiff alleges that these removals occurred after each instance of protected EEO activity. Plaintiff further alleges that she performed the inspections but that other employees later received credit for her work. Plaintiff identifies Quentin Johnson, Fire Management Officer, and Marlon Avantyr, former Grand Canyon housing employee, as individuals who accompanied her during inspections, confirming that she performed the work before the responsibilities were reassigned.

**54.** In December 2024 and continuing into fiscal year 2025–2026, Plaintiff's housing related authority was further reduced. The affected functions included housing inspections, tenant placement, housing assignments, and housing related contract and signatory functions. Plaintiff alleges that these removals occurred after her protected activity in FS 2024 00693 and FS 2025 00372 and were part of the continuing retaliatory hostile work environment.

**55.** Plaintiff's former responsibility for placement of tenants in government housing was removed in or about December 2024. Plaintiff states that the tenants were typically seasonal fire employees residing in Forest Service owned houses, bunkhouses, and trailer pads. Plaintiff alleges that the removal of tenant placement responsibilities materially changed her supervisory role and transferred functions she had previously performed to other personnel.

**56.** Plaintiff's responsibility for Tusayan housing contracts was removed or reassigned in or about December 2025. Plaintiff states that Tusayan housing contracts were rental agreements necessary because there was no other available housing in the Tusayan area. Plaintiff alleges that these contracts were later assigned to Joel Dorsey after he was promoted to a higher pay grade, and that the transfer was used to justify the promotion. Plaintiff does not allege that Dorsey's promotion was unlawful, but

alleges that the removal of her responsibilities and reassignment to Dorsey occurred in close temporal proximity to her protected activity and constitutes reprisal.

**57.** On November 17, 2025, Deputy District Ranger Chelsea Muise informed Plaintiff that Debra Mollet had signed the delegation letters changing the housing authority and stated that Plaintiff should already have received a copy of the delegation. Plaintiff alleges that this communication confirms that Mollet exercised authority to remove Plaintiff's housing responsibilities. See Plaintiff Exhibit Twenty Two.

**58.** On December 11, 2025, Melissa Keeney informed Plaintiff: "Hey Lady, I do not have you as an inventory taker for FY26. Chelsea Muise or Debra Mollet sign the inventories and Pinyon." Plaintiff thereby learned that she was no longer designated as an inventory taker for fiscal year 2026. Plaintiff alleges that this removal occurred after the acceptance of FS 2025 00372 and constitutes ongoing reprisal.

**59.** On December 17, 2025, Plaintiff expressed to Keeney that she was unhappy to learn that she could not sign or have a say in the housing matters. Plaintiff alleges that the communications demonstrate that the loss of authority was not merely hypothetical; Plaintiff understood that functions she had previously performed had been taken from her and reassigned to others.

**60.** The FY26 Quarters Signatory Delegation confirms that signatory authority for housing related functions, including Annual Inventory, Service Rate Forms, Government Housing Assignment Agreements, Rent Change Notices, and Unused Floor Space, had been delegated within the management chain for the fiscal year beginning October 1, 2025. Plaintiff's name does not appear as the official exercising those signatory functions. Plaintiff alleges that this removal occurred after the filing and acceptance of FS 2025 00372 and constitutes ongoing reprisal and harassment. See Plaintiff Exhibit Twenty Two.

**61.** Plaintiff alleges that the manner in which her responsibilities were removed was significant. Plaintiff states that there was no written notice informing her that the responsibilities had been removed before she attempted to perform the work. She learned of the changes from other Agency personnel, including personnel outside her immediate duty location, when she attempted to perform duties she had previously performed. Plaintiff states that she was not given a written explanation stating why the authority had been removed, the effective date of the removal, whether the removal was temporary or permanent, or when the responsibility would be restored.

**62.** Plaintiff alleges that the removal of these supervisory functions affected her ability to perform her job as a supervisor. Plaintiff states that she could no longer perform certain duties in a timely manner without seeking guidance or permission from other personnel. Plaintiff specifically provides as an example that, after losing authority over repairs, she had to contact Engineering to obtain permission to address a leaking toilet and kitchen faucet in older Forest Service facilities. Plaintiff alleges that the loss of authority therefore interfered with her ordinary performance of supervisory responsibilities and diminished her ability to manage her assigned work.

**63.** Plaintiff further alleges that the removal of these functions diminished her authority and standing in the workplace. She states that the responsibilities remained necessary to the operation of the Ranger District, but that the authority to perform them was transferred from her to other personnel while she remained employed as a supervisor. Plaintiff alleges that this made the change visible within the workplace and caused her to believe that her role was being progressively reduced. Plaintiff further alleges that the removal of responsibilities prevented her from being considered for monetary awards and promotions. Plaintiff states that she was nominated for a $1500 award along with Gia Cassady, but Debra Mollet denied Plaintiff's award while granting Cassady's. Plaintiff alleges that this denial,

combined with the removal of her job authority, demonstrated that she would not be promoted and that her career advancement was being obstructed.

**64.** Plaintiff alleges that the unexplained nature of the removals caused her significant concern about the future of her position. She did not receive a written determination explaining whether the loss of responsibilities was disciplinary, performance related, administrative, temporary, or permanent. She was therefore left to discover changes to the scope of her authority as she encountered them while performing her work. Plaintiff alleges that the absence of any formal explanation or restoration date contributed to an ongoing sense of professional uncertainty and intimidation. Plaintiff further alleges that she feared her position would be eliminated, particularly given the escalating pattern of reprisal following her EEO activity.

**65.** Plaintiff alleges that the repeated removal of supervisory duties is relevant to her reprisal claim because the conduct occurred after she engaged in protected EEO activity and continued over subsequent periods in which she was pursuing or opposing EEO matters. Plaintiff alleges that her job authority was removed after each EEO case: FS 2023 00277, FS 2024 00693, FS 2025 00372, and FS 2026 00121. Plaintiff alleges that the sequence of events demonstrates a continuing retaliatory hostile work environment rather than isolated administrative decisions. Plaintiff alleges that the repeated nature of the removals, rather than any single isolated change, is significant to the hostile work environment claim.

**66.** Plaintiff alleges that the removal of her supervisory duties materially affected the terms, privileges, and conditions of her employment. Plaintiff states that she could not perform her supervisory duties independently, could not manage repairs, could not order supplies, could not place tenants, could not manage housing contracts, and could not perform housing inspections. Plaintiff alleges that these removals prevented her from performing the core functions of her position, diminished her authority,

interfered with her ability to manage her work, and created a workplace environment in which she was treated as subordinate to employees who had previously relied upon her for guidance. Plaintiff alleges that these changes were reasonably likely to deter a reasonable employee from engaging in protected activity.

**67.** Plaintiff alleges that the repeated removal of supervisory duties is relevant to her reprisal claim because the conduct occurred after she engaged in protected EEO activity and continued over subsequent periods in which she was pursuing or opposing EEO matters. Plaintiff alleges that the sequence includes the removal of responsibilities beginning in or about March 2023, additional housing related authority changes in or about March 2024, the removal of purchasing authority and the Government purchase card in or about February 2025, additional office purchasing and repair responsibilities in or about March 2025, and additional housing related changes thereafter. Plaintiff alleges that the repeated nature of the removals, rather than any single isolated change, is significant to the hostile work environment claim. It is currently September of 2026 and Plaintiffs job responsibility's have not been returned, it is reasonable to believe that they will not be. Therefore she now includes them in this civil action. *Under National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115–17 (2002), *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–23 (1993), and *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998), Plaintiff alleges that the permanent removal of her job responsibilities through September 2026 forms part of the same continuing retaliatory hostile work environment and is properly included in this civil action.

**68.** The EEOC has recognized that the removal of supervisory duties may constitute a present loss or harm concerning a term, condition, or privilege of employment and may be reasonably likely to deter protected EEO activity. See Foss v. Department of the Navy, EEOC Appeal No. 01975357 (July 29, 1998); Margaret L. v. Postmaster General, EEOC Appeal No. 2023002130 (2023). In Margaret L., the

Commission specifically considered an allegation that the complainant's supervisory duties were removed and found that the allegation identified a present harm or loss with respect to a term, condition, or privilege of employment. Plaintiff alleges facts materially relevant to that principle because the responsibilities at issue here were previously assigned to Plaintiff, were removed from her, and were thereafter performed or controlled by other employees.

**69.** Plaintiff's claim does not depend upon the Agency formally changing her position title. The issue is the actual removal of responsibilities and authority from the work Plaintiff was performing. Plaintiff alleges that she remained in the same position while portions of the authority necessary to perform that position were progressively removed from her. The Commission has recognized that a complainant may state a reprisal claim where supervisory duties are removed even though the employee technically remains in the same job classification.

**70.** Plaintiff alleges that the removal of her Government purchase card authority is documented in Plaintiff Exhibit Twenty One, Company Credit Card Records. The records show that Plaintiff's account remained listed as open but was reduced to a one dollar credit limit, with only one dollar available credit. The last transactions occurred in early 2025, after which the card was effectively disabled. Plaintiff alleges that this demonstrates her purchasing authority was stripped, materially changing her job responsibilities.

**71.** Plaintiff alleges that the removal of housing responsibilities is documented in Plaintiff Exhibit Twenty Two, Housing Delegation Records. Emails from Deputy District Ranger Chelsea Muise confirm that Debra Mollet signed delegation letters removing Plaintiff's authority. Plaintiff further alleges that Teams communications from Melissa Keeney on March 3, 2026 state, "Yeah, each year she can change delegations," confirming that Mollet personally exercised authority to remove Plaintiff's housing inspection and signatory responsibilities.

**72.** Plaintiff alleges that the FY26 Quarters Signatory Delegation Letter, included in Plaintiff Exhibit Twenty Two, shows that Plaintiff's authority was altered. Inventory inspection duties were reassigned to Mollet or Muise, while Plaintiff's prior housing inventory reports bear her digital signature dated December 8, 2025. Plaintiff alleges that this confirms she previously held the authority before it was removed.

**73.** Plaintiff alleges that the Government Housing Inventory records, included in Plaintiff Exhibit Twenty Two, further demonstrate that Plaintiff had performed housing inspections and signed official inventory reports before her authority was withdrawn. Plaintiff alleges that the removal of these responsibilities materially changed her supervisory role and required other personnel to assume functions she had previously performed.

**74.** Plaintiff alleges that the cumulative effect of these removals, documented in Plaintiff Exhibits Twenty One and Twenty Two, demonstrates a pattern of retaliation. The removal of purchasing authority, housing inspections, housing inventory, tenant placement responsibilities, repair responsibilities, and housing contract responsibilities occurred after Plaintiff engaged in protected EEO activity. Plaintiff alleges that the absence of formal notice, the reassignment of duties to other personnel, and the repeated nature of the removals are circumstances from which a fact finder may infer retaliatory motive and pretext.

**75.** Plaintiff alleges that the removal of supervisory duties, purchasing authority, housing responsibilities, and repair responsibilities must be considered together with the other acts pleaded in this Complaint. The HART proceedings, the Agency's handling of Plaintiff's EEO activity, the involvement of the same management structure, the conduct concerning Plaintiff's personal financial information, the procedural events surrounding the EEOC proceedings, and the repeated removal of Plaintiff's supervisory authority occurred within the same employment relationship. Plaintiff alleges

that the cumulative circumstances demonstrate a continuing retaliatory hostile work environment rather than unrelated administrative events.

**76.** Plaintiff alleges that the repeated removal of her job functions, together with the other conduct described in this Complaint, contributed to the conditions of employment and workplace environment that followed her protected EEO activity. Plaintiff alleges that the Agency's progressive reduction of her responsibilities, without formal notice or explanation and while the same management structure remained involved in her EEO matters, was reasonably likely to deter her and other reasonable employees from continuing to oppose or report unlawful discrimination and forms part of the continuing retaliatory hostile work environment alleged in this action.

**WEAPONIZATION OF THE HART PROCESS: RETALIATORY USE OF THE AGENCY'S MANDATORY HARASSMENT REPORTING MECHANISM TO OBSTRUCT OPPOSITION AND EEO PARTICIPATION**

**77.** Plaintiff's claims arise against the backdrop of protected EEO activity that began in 2023. In March 2023, Plaintiff contacted the Agency's Office of Civil Rights and initiated an EEO matter concerning harassment and discrimination. The Agency assigned Complaint No. FS 2023 00277 and expressly identified age (YOB 1959) and sex as alleged bases of discrimination. The Agency's April 7, 2023 Notice of Right to File specifically informed Plaintiff that she had the right to file a formal discrimination complaint with the Department of Agriculture. See (Plaintiff Exhibit Six, Notice of Rights, Date April 7, 2023). This 2023 EEO activity is the starting point for Plaintiff's reprisal claim in this action, and Plaintiff incorporates this section into all subsequent sections of this Complaint because the retaliatory conduct that followed in 2024, 2025, and 2026 must be evaluated in the cumulative context of management's continuing knowledge of her protected activity. The allegations in this section were timely raised in front EEOC Administrative Judge Eric Yau, EEOC No. 833-2026-00328X, Date: 2/25/2026. See; ( Plaintiffs Exhibit Ten, Motion To Amend EEOC No. 833-2026-00328X ), Page 9-12

¶¶ 9, 9A, 9B, 9C, 9D, 9E, 9F, 9G, 9H. Administrative Judge Eric Yau, denied Plaintiffs Motion to Amend on April 16, 2026. Plaintiff filed a written objection to Judge Eric Yau, ruling denying Plaintiffs motion to preserve the issue on 4/17/2026, see; ( Plaintiffs Exhibit Ten C ).

**78.** Plaintiff was born in 1959 and was the oldest employee in her work group. From Plaintiff's perspective, she performed her duties professionally, followed the rules, and did her work by the book. She had no reasonable basis to understand the increasingly adverse treatment directed toward her as anything other than connected to her age and her having opposed and reported what she reasonably believed to be unlawful discrimination and harassment. Plaintiff's belief was based upon her position as the oldest employee in the group, the manner in which management treated her, the circumstances surrounding the conduct reported in her 2023 EEO matter, and what subsequently occurred after management became aware of that protected activity.

**79.** The Agency had actual and contemporaneous knowledge of Plaintiff's protected EEO activity. On March 22, 2023, EEO Counselor Cathy Fowler Johnson, of the Forest Service Civil Rights Staff, sent a written "Notice of a Pre complaint" concerning Plaintiff's March 10, 2023 contact with the Agency to initiate an EEO pre complaint alleging discrimination. The Counselor expressly identified the claim as discrimination and harassment based on age (YOB: 1959) and sex, identified Nora McArdle, Plaintiffs first line supervisor, as the Responding Management Official, and requested management's knowledge, involvement, and actions concerning the claim. The notice was sent to McArdle and copied to Nicole Branton and Debra Mollet. See: (Plaintiff Exhibit Five, Agency Knowledge). Thus, before the 2024 conduct alleged herein, Branton and Mollet had actual notice, through the Agency's own EEO office, that Plaintiff had engaged in protected EEO activity concerning alleged age discrimination and harassment.

**80.** The underlying facts of the 2023 EEO matter further demonstrate why the 2023 complaint is the foundation of Plaintiff's reprisal and Hostile Working Environment claim. On March 10, 2023, Nora McArdle, Plaintiff's then supervisor, directed Plaintiff to report to the Tusayan office, more than 60 miles from her regular duty location, to perform work associated with processing payments for firewood, this was not the Plaintiff s job, See; ( Plaintiffs Exhibit Seven, Job Description Administrative Support Assistant GS-0303-07, 10/23/2013 ), Factor 9. "Work is performed in an office environment". Plaintiff explained that she could not work at Tusayan every day. McArdle responded by telling Plaintiff to "find a new desk" and that she needed to "find another job." Plaintiff reported this conduct through the EEO process.

**81.** The Agency's March 22, 2023 EEO Counselor notice therefore confirms that Plaintiff did not present the March 10 reassignment merely as a dispute over a work assignment. The Agency expressly identified the allegation as discrimination and harassment based on age and sex.

**82.** The same event was also investigated separately through HART. The 2023 HART Inquiry Report identified Case No. H-2023-00122 and described the issues as whether McArdle engaged in intimidating or harassing behavior by requiring Plaintiff to work at the Tusayan Office, but first check in at Williams office, over sixty miles away, then take a Forest Service vehicle to Tusayan starting on March 10, 2023, when fire wood permits were not being sold until, April 14, 2023, advising George she spoke with George's Supervisor about locating a different desk for George to work at, George asserts McArdle began threatening her job and telling her she needed to "find a new desk," and attempting to have Plaintiff inappropriately change the rental rating of McArdle's residence from fair to poor so McArdle's rent would be less. George asserts McArdle also said, "this isn't going to work out between us." See: ( Plaintiffs Exhibit Eight, Monday, April 10, 2023, HART INQUIRY REPORT ). located in EEOC Agency investigative file, ROI, FS-2024-00693, VOL. 4

**83.** The distinction between the 2023 HART investigation and the 2023 EEO complaint is therefore important to the later events. The same underlying workplace conduct was being addressed through both mechanisms, but the EEO process expressly identified age as a protected basis while the HART inquiry addressed the conduct as harassment. Plaintiff alleges that this pattern was repeated in 2024: workplace conduct was placed into HART, while the EEO discrimination and reprisal components were not developed through that process, the Agency's HART investigation process.

**84.** The Agency later used the March 10, 2023 reassignment as part of its characterization of why Plaintiff had initiated the 2023 matter, even though the Agency's own EEO Counselor notice expressly identified age and sex as the bases of discrimination. The reassignment to Tusayan was therefore not merely an independent piece of background evidence. It demonstrates that Plaintiff had already made an explicit age discrimination complaint before the events giving rise to the present reprisal claim and that the Agency knew that age was part of the protected activity.

**85.** The Agency's own investigative record further demonstrates that it retained and used the HART materials in the later EEO proceeding. The HART Inquiry Report, H-2024-00013, was included in the Agency's investigative file and ROI for FS-2024-00693, EEOC No. 540-2025-00189X. Volume 4. (Plaintiff's Exhibit Eight.) The same ROI expressly identified the accepted complaint as whether Plaintiff was subjected to nonsexual harassment based on age. (Plaintiff's Exhibit Eight A, ROI, FS-2024-00693, EEOC No. 540-2025-00189X ). Plaintiff asserts that the Agency therefore cannot consistently maintain that the HART matter was wholly separate from the EEO proceeding while simultaneously incorporating the HART investigative materials into the EEO investigative record and relying upon the HART matter in support of dismissal. Plaintiff further asserts that the Agency's use of the HART investigation was selective: the HART materials were available and incorporated into the EEO record, yet the allegations contained within those materials were not developed as part of the

harassment investigation and were instead used by the Agency to support procedural defenses and dismissal.

**86.** The timing and repetition are significant. In 2023, Plaintiff reported age discrimination and harassment involving Nora McArdle. The matter was assigned both an EEO complaint number, FS-2023-00277, and a HART number, H-2023-00122. In 2024, Plaintiff again reported harassment involving management officials, including Debra Mollet, and the matter was again assigned a HART number, H-2024-00013. Nicole Branton was connected to both matters: she was within the management structure supervising the 2023 RMO, Nora McArdle, and in 2024 she was Plaintiff's second level supervisor, was identified as an RMO, She was the Supervisor of Debra Mollet the named RMO in the case. Nicole Branton personally issued the July 16, 2024 HART decision. This July 16th allegation was timely raised in front EEOC Administrative Judge Eric Yau. 833-2026-00328X, Date: 2/25/2026. See; ( Plaintiffs Exhibit Ten, Motion to Amend. EEOC No. 833-2026-00328X ), page 10, ¶ 9B. And complaints written objection, see; ( Plaintiffs Exhibit Ten C ). Page 2 ¶¶ 7, 8, page 3, ¶¶ 9, 10, 11.

**87.** Branton therefore provides an important management nexus between the protected activity and the later conduct. The 2023 matter placed Plaintiff's EEO activity concerning age before management. The 2024 matter involved another management official, Debra Mollet, within the same management structure, while Branton was herself identified as an RMO in the later matter and personally closed the HART proceeding. Plaintiff alleges that the repeated involvement of the same management structure, together with the Agency's subsequent procedural handling of the HART matter, supports an inference that the later conduct was connected to Plaintiff's prior EEO activity rather than being a series of unrelated administrative events.

**88.** The 2023 matter also established an important feature of what Plaintiff would later encounter: the Agency had separate mechanisms for addressing workplace harassment and discrimination. Plaintiff was a lay employee, not an EEO specialist, attorney, or trained Agency official. When the Agency directed or routed workplace harassment allegations into its Anti Harassment process, Plaintiff had no reason to understand that using the Agency's designated harassment process would later be used to argue that she had failed to pursue the EEO process.

**89.** Plaintiff did not knowingly abandon or waive her EEO rights. She continued reporting conduct that she reasonably believed was unlawful and connected to the age based treatment that had already been the subject of her 2023 EEO activity. When the Agency required her to proceed through its Anti Harassment process, Plaintiff followed the process the Agency placed before her. She did not control whether the Agency classified, routed, or investigated her allegations through HART rather than through the EEO process.

**90.** The Agency's own Office of Civil Rights later confirmed the significance of the distinction between HART and the federal sector EEO process. On June 24, 2026, Shane Zimmerman, Deputy Director of the Forest Service Office of Civil Rights, explained why the HART report was not included in an EEO complaint, stating: "Because the HART complaint is handled under another separate process, not a federal sector EEO complaint. Its investigation, findings, and documents belong to a different legal pathway and are not part of the federal EEO record." Zimmerman further stated that HART and EEO "Can Overlap, but They Don't Combine." See: (Plaintiff Exhibit One A, Zimmerman Email, AH is Mandatory).

**91.** Zimmerman's June 24, 2026 explanation is significant to Plaintiff's allegations because it establishes the Agency's own understanding of the relationship between the two processes after the events at issue had already occurred. The Agency characterizes AH/HART as a mandatory reporting

mechanism, while describing EEO as a voluntary, separate process, that an employee must pursue to obtain relief under federal EEO law. Plaintiff alleges that this structure is precisely what occurred in her case: she was required or directed to use HART to report harassment, but the HART process did not develop the discrimination and reprisal allegations that were central to her protected EEO activity. Plaintiff was not given the same EEO procedural development through HART, yet the Agency later relied upon the absence of a separately initiated EEO process to defeat her claims.

**92.** In January 2024, Plaintiff again reported serious workplace conduct involving harassment, intimidation, bullying, invasion of privacy, and retaliation. The Agency directed or routed that matter into its Anti Harassment process and assigned H-2024-00013. Plaintiff followed the process the Agency placed before her. She had no reason to believe that complying with the Agency's designated harassment process would later be characterized as failing to pursue her EEO rights.

**93.** The subsequent EEO Counselor Report confirms that H-2024-00013 was the same Anti Harassment matter that formed the basis of Plaintiff's later EEO claims. The Counselor Report for Agency Case No. FS-2024-00693 identifies Plaintiff's bases as age and reprisal based on her prior EEO activity in FS-2023-00277. It specifically identifies as one of the allegations that, on July 16, 2024, Nicole Branton informed Plaintiff that the Anti Harassment matter had no findings. The Counselor Report also expressly identifies the prior forum as the "FS Anti Harassment Process H-2024-00013 July 16, 2024." See; **(** Plaintiff Exhibit Three, 8/9/2024 Counselors Report**).** Thus, H-2024-00013 was not a separate later HART matter created for purposes of the EEO case. It was the same HART matter that Plaintiff had pursued and that later became part of the EEO allegations.

**94.** Plaintiff provided a lengthy written statement concerning the conduct, together with 127 pages of supporting information and documentation. Her February 16, 2024 submission described invasion of privacy, bullying, hostile work environment, intimidation, harassment, and retaliation. Plaintiff was

attempting to communicate what had happened to her and to obtain relief from conduct she reasonably believed was unlawful. The fact that the HART inquiry did not separately ask her whether the conduct was because of age does not change what Plaintiff was attempting to accomplish when she reported the conduct. Zimmerman's June 24, 2026 explanation is significant, he states; "If Civil Rights receives a harassment report, it is sent to AH. If AH sees possible discrimination based on a protected class, the *employee is informed of their right to file an EEO complaint,*" he states; It is mandatory for employees and supervisors to report harassment through AH,--.( Plaintiffs Exhibit One, Plaintiffs Exhibit A, One Zimmerman Email ).

**95.** Critically, the HART process did not operate as an EEO discrimination investigation. Plaintiff was not asked in the HART inquiry whether the conduct was because of her age or another protected status. She was therefore not given the same opportunity to develop the protected status allegations that had expressly been identified in her 2023 EEO complaint, HART was mandatory first. Plaintiff did not understand that the Agency's use of HART meant that the discrimination component of what she was reporting would not be investigated through the EEO process.

**96.** This distinction became consequential because the Agency's actual handling of Plaintiff's HART record does not correspond with the explanation later provided by Zimmerman. The HART Inquiry Report for H-2024-00013 was included in the Agency's investigative record and Report of Investigation for FS-2024-00693, Volume 4. See: (Plaintiff Exhibit Eight; Plaintiff Exhibit Eight A, ROI, FS-2024-00693). Thus, in Plaintiff's case, the HART investigation and its contents were not confined to a separate administrative process. The HART material was incorporated into the federal sector EEO investigative record, notwithstanding the Agency's later statement that HART investigation, findings, and documents "are not part of the federal EEO record." See: ( Plaintiffs Exhibit One, Zimmerman Email ).